UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PENDLETON HEIGHTS GAY-STRAIGHT ALLIANCE, an unincorporated association, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:21-cv-02480-JRS-TAB |
| SOUTH MADISON COMMUNITY SCHOOL CORPORATION, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**Memorandum in Support of Motion for Preliminary Injunction**

**Introduction**

  The Equal Access Act, 20 U.S.C. § 4071, is explicit. If a school that receives federal financial assistance allows one or more non-curriculum related groups to meet at the school during noninstructional time, it cannot discriminate against a group based on the content of the group's speech. Groups not only must be allowed to meet on an equal footing but must be allowed the same access to the means of publicizing and advancing the group's activities. Although the defendants ("School") allow the Pendleton Heights Gay-Straight Alliance (PHGSA) to meet at Pendleton Heights High School during noninstructional time, the School prohibits the group from being able to advertise at the high school, despite allowing other groups, both those related to the curriculum and those not related, to do so. PHGSA also is not and will not be listed in the Student

[1]

Handbook. Not only does this violate the Equal Access Act, but it violates the rights of PHGSA and its members secured by the First Amendment and the Equal Protection Clause. All the other requirements for the grant of a preliminary injunction are met and one should issue, without bond, so that PHGSA and its members may be afforded the equal access demanded by the Equal Access Act and the Constitution.

**Facts[1]**

Pendleton Heights High School is a public high school, located in Pendleton, Indiana. (Declaration of Reece Axel-Adams [attached to this memorandum as Exhibit 1] ["Axel-Adams Dec."] ¶ 2). It contains approximately 1,400 students in grades 9-12. (Axel-Adams Dec. ¶ 3).

The Pendleton Heights Student Handbook lists a number of school clubs or groups that are allowed to meet during noninstructional times at the school. (Axel-Adams Dec. ¶ 7; Attachment to Axel-Adams Dec. ["Handbook" excerpt] at 73-76). The groups include those that are obviously directly tied to courses at the school, such as foreign language clubs. (Handbook at 74-76 [listing a German National Honor Society, German Club, French Honor Society, French Club, Spanish Honor Society, and Spanish Club]). It also lists groups that are not directly related to courses at the school and that do not lead to academic credit. (*Id.* [listing Best Buddies, a group "dedicated to ending the social,

_____

[1]      Inasmuch as no discovery has yet occurred in this case, PHGSA reserves the right to present further evidence prior to, or at, the preliminary injunction hearing.

[2]

physical and economic isolation of the 200 million people with intellectual and developmental disabilities"; Mat Maids, a group supporting wrestling; SADD, a group promoting the making of good choices and leading a healthy lifestyle; and Outdoor Adventure Club, a group providing outdoor activities to interested students]; Axel-Adams Dec. ¶ 9). Additionally, other groups are allowed to meet at the high school that are not in the Handbook. These include Fellowship of Christian Athletes; E-gaming, for electronic game enthusiasts; Robotics, for those interested in building robots; and Bring Change to Mind, which encourages dialogue about mental health. (*Id*. ¶12). Participation in these groups is not required by any course and does not result in academic credit. (*Id.* ¶ 13).

Another group that is being allowed to meet at the school during noninstructional time is PHGSA. (*Id.* ¶ 16). It is not listed in the Handbook. (Handbook at 74-76). PHGSA is a group that allows gay, lesbian, bisexual, transgender, non-binary and allied students to meet in order to provide social, emotional, and educational support to each other. (Axel-Adams Dec. ¶ 17.  It also serves to inform the school community as a whole of the existence of gay, lesbian, bisexual, and transgender students and is designed to foster acceptance of all students regardless of their sexual orientation. (*Id.*). It had existed at the high school in prior years, although it ceased regularly meeting until recently. (*Id.* ¶ 14). It now has a faculty sponsor and meets in her classroom after instructional time. (*Id.* ¶

18). Its meeting has caused no disruption to the school or to the educational environment. (*Id.*).

Many of the groups at the high school, including some that are not directly related to curricular offerings, are allowed to publicize their existence and meetings by posting information on bulletin boards at the school. (*Id.* ¶¶ 11-13). Their activities may be mentioned in the daily announcements at the High School that are broadcast on the school's radio station. (*Id.*). However, the Principal of the high school has determined that PHGSA is an "unofficial" club and as such is not allowed to advertise at the school and will not be publicized through the announcements on the radio station. (*Id.* ¶ 19). As an "unofficial" club it is not and will not be listed in the Student Handbook. (*Id.*). It is unclear whether there are any other "unofficial" clubs that are so burdened as, for example, Fellowship of Christian Athletes is not listed in the Handbook but is allowed to advertise on school bulletin boards and be mentioned on the announcements broadcast through the radio station. (*Id.* ¶ 13).

The rationale of the Principal in denying PHGSA the same access that other groups are provided is that when it comes to issues concerning gay, lesbian, transgender, non-binary, and similar persons, the School must remain neutral. (*Id.* ¶ 20).

Given that PHGSA has only recently resumed operation it needs to be able to advertise to grow its membership. (*Id.* ¶ 21). Moreover, PHGSA fulfills a vitally important role in providing a place of care and community for a group of students who often lack

[4]

such support. (*Id.* ¶ 22). The inability of PHGSA to advertise and expose students to its existence and beneficial purposes is causing it to have fewer members than it would if it were given the same ability as other clubs to advertise. (*Id.* ¶ 23). And this inability severely hinders and impedes the basic purpose of PHGSA, which is to be a place of shelter, support, and education, not just for gay, lesbian, transgender, and non-binary students, but for all students at the high school. (*Id.* ¶ 24). This limitation also subverts its purpose to assist the school community as a whole in becoming comfortable with these students and in fostering tolerance and acceptance. (*Id.* ¶ 17).

Pendleton Heights High School receives Federal financial assistance as can be seen by, among other things, its participation in the United States Department of Agriculture free lunch and breakfast program. (Exhibit 2 to this Memorandum [South Madison Community School Corporation, *USDA Free Meals Waiver*, http://smadison.k12.in.us/departments/nutrition_services/u_s_d_a_free_meals_waiver (last visited 10/6/21) (referring to the high school as well as elementary and middle school)]).[2]

**The preliminary injunction standard**

The standard in the Seventh Circuit for the granting of a preliminary injunction is

---

[2]   The receipt of USDA funded school meals is, of course, "federal financial assistance." *See, e.g., Jauquet v. Green Bay Catholic Education*, 2020 WL 5016817, *1 (E.D. Wisc. Aug. 25, 2020) ("Defendant operates a Catholic school system … and receives federal financial assistance including funding through the National School Lunch Program.") (referring to a claim under Title IX, 20 U.S.C. § 1681(a)), *aff'd* 996 F.3d 802 (7th Cir. 2021).

clear. In order to determine whether a preliminary injunction should be granted, the

Court weighs several factors:

(1) whether the plaintiff has established a prima facie case, thus
demonstrating at least a reasonable likelihood of success at trial;

(2) whether the plaintiff's remedies at law are inadequate, thus causing
irreparable harm pending the resolution of the substantive action if the
injunction does not issue;

(3) whether the threatened injury to the plaintiff outweighs the threatened
harm the grant of the injunction may inflict on the defendant; and

(4) whether, by the grant of the preliminary injunction, the public interest
would be disserved.

*See, e.g., Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987). The heart

of this test, however, is "a comparison of the likelihood, and the gravity of two types of

error: erroneously granting a preliminary injunction, and erroneously denying it." *Gen.*

*Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984).

**Argument**

**I.     PHGSA will prevail on the merits of its claims**

**A.     The actions of the School violate the Equal Access Act**

**1.     The Equal Access Act applies when a covered school has one or
more clubs that are not directly related to the courses offered by
the school**

The Equal Access Act provides that:

It shall be unlawful for any public secondary school which receives Federal
financial assistance and which has a limited open forum to deny equal
access or a fair opportunity to, or discriminate against, any students who
wish to conduct a meeting within that limited open forum on the basis of
the religious, political, philosophical, or other content of the speech at such
meetings.

20 U.S.C. § 4071(a). The Act further states that "[a] public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." 20 U.S.C. § 4071(b).

In *Board of Education of Westside Community Schools v. Mergens*, 496 U.S. 226 (1990), a proposed student Christian club claimed a violation of the Equal Access Act after it was not allowed to meet at a high school as a recognized club. The Court noted that the Equal Access Act was triggered when a school allows one or more noncurriculum related school groups to meet during noninstructional time, but that the Act did not define the term "noncurriculum related student groups." *Id*. at 237.  However, after examining the statutory language and its broad legislative purpose, the Court concluded

> that the term "noncurriculum related student group" is best interpreted broadly to mean any student group that does not *directly* relate to the body of courses offered by the school. In our view, a student group directly relates to a school's curriculum if the subject matter of the group is actually taught, or will soon be taught, in a regularly offered course; if the subject matter of the group concerns the body of courses as a whole; if participation in the group is required for a particular course; or if participation in the group results in academic credit. We think this limited definition of groups that directly relate to the curriculum is a commonsense interpretation of the Act that is consistent with Congress' intent to provide a low threshold for triggering the Act's requirements.

*Id*. at 239-40 (emphasis by the Court).

The Court therefore concluded that a club is not curriculum related if it is only "remotely related to abstract educational goals." *Id*. at 244. Applying the Act's "low

threshold" the Court concluded that the school's Peer Advocates program, a service group working with special education classes, was not curriculum related. *Id.* at 245-46. Similarly, the school's Chess Club was not directly related to any class. *Id.* at 245.  Nor was the scuba diving club. *Id.*  The Court therefore found that the school was subject to the Equal Access Act and a "limited open forum" had been created. *Id.* at 247.

Given this, the question was whether the statutory rights of the Christian club, which was not allowed to formally meet as a recognized club, had been violated. The Court acknowledged that the group had been allowed to meet informally after school hours, but that the proposed club "seek[s] equal access in the form of official recognition by the school. Official recognition allows student clubs to be part of the student activities program and carries with it access to the school newspaper, bulletin boards, the public address system, and the annual Club Fair." *Id.* at 247 (internal citation omitted). Inasmuch as the statute prohibits the denial of equal access on the basis of, among other things, the religious content of the group, the Court concluded that the proposed student group's rights under the statute had been denied. *Id.*

Following *Mergens* numerous cases have found that once a school creates a "limited open forum" by allowing at least one noncurriculum related group to meet, it must allow gay-straight alliances (GSAs) to meet. *See, e.g., Straights and Gays for Equality (SAGE) v. Osseo Area Schools-Dist. No. 279*, 540 F.3d 911 (8th Cir. 2008) ("*SAGE II*") (given that the school had noncurriculum groups the Equal Access Act was violated by the

limitations imposed on the school GSA that were not imposed on other noncurriculum

related groups); *Carver Middle School Gay-Straight Alliance v. School Bd. of Lake Co., Florida*,

249 F. Supp. 3d 1286, 1290 (M.D. Fla. 2017) (rejection of an application by a proposed

school GSA violated the Equal Access Act); *Gonzalez through Gonzalez v. School Bd. of*

*Okeechobee Co.*, 571 F. Supp. 2d 1257, 1267 (M.D. Fla. 2008) (Equal Access Act required that

school recognize GSA as a noncurricular student group); *White Co. High School Peers*

*Rising In Diverse Education v. White County School District*, 2006 WL 1991990, *12 (N.D. Ga.

July 14, 2006) (given that the school maintained a limited open forum under the Equal

Access Act, the refusal to allow a GSA to meet violated the Act); *Boyd County High School*

*Gay Straight Alliance v. Bd. of Educ. of Boyd County, Ky.*, 258 F. Supp. 2d 667, 693 (E.D. Ky.

2003) (granting a preliminary injunction in favor of a student GSA, finding that it was

likely to establish a violation of the Equal Access Act); *Franklin Central Gay/Straight*

*Alliance v. Franklin Twp. Comm. School Corp.*, 2002 WL 32097530, *21 (S.D. Ind. Aug. 30,

2002) (granting summary judgment to the GSA and finding that the school's refusal to

allow it to meet as an official club violated the Equal Access Act).

Of course, once a limited open forum is created a student group not only must be

allowed to meet but must be given the same access as other groups to the benefits of being

a recognized group. *Mergens,* 496 U.S. at 247. Thus, if other student groups, even though

not directly curriculum related, are allowed to be formally recognized by the school and

to advertise, all groups must be treated similarly. In *SAGE II* the GSA had been allowed

to meet at the school ("MGHS") but had not been granted the same communication access as groups labelled by the school as curriculum related but were not actually so. 540 F.3d at 913. This partial access did not satisfy the requirements of the Equal Access Act.

> Here, MGHS does not prohibit SAGE from meeting at the school or utilizing some avenues of communication, but it limits SAGE's access to communication avenues and meeting times and places. Curricular groups receive more extensive use of school communication avenues. Thus, the issue is not whether MGHS provides SAGE access to some avenues of communication but whether it provides equal access to available avenues of communicate as provided to other noncurriculum related groups. We hold that it does not.

*Id.* at 914 (footnote omitted). Accordingly, the court affirmed the judgment of the district court that had enjoined the school to provide the GSA "with the same access for meetings, avenues of communication, and other miscellaneous rights that are afforded to MGHS's student groups classified as 'curricular.'" *Id.* at 912. A school must allow "the GSA all attendant benefits uniformly afforded to each of its noncurricular student groups and may not place restrictions on the GSA that are not uniformly applied to all noncurricular student groups." *Gonzalez*, 571 F. Supp. 2d at 1267. And, in *Boyd County*, the court concluded that

> defendants must give the GSA Club and its members equal access to those activities of student groups permitted at BCHS and not directly related to the curriculum, including the opportunity to meet before school (as the Bible Club has done), after school (as the drama group has done), and during home room (as many other student groups have done); to submit announcements about schedule changes and events to be read over the loudspeaker during home room, to submit information about the GSA Club to be published in the school newspaper, and to post information about GSA Club meetings and activities on the appropriate school bulletin

[10]

boards.

258 F. Supp. 2d at 693.

### 2.    A limited open forum exists at Pendleton Heights High School

"The circle of groups considered 'curriculum related' has a relatively small circumference." *Straights and Gays for Equality (SAGE) v. Osseo Area Schools-District No. 279*, 471 F.3d 908, 911 (8th Cir. 2006) ("*SAGE I*"). Here the evidence is clear that there are numerous groups at Pendleton Heights High School that are outside of this small area—they are noncurriculum related. These include Mat Maids, Students Against Destructive Decisions ("SADD"), Fellowship of Christian Athletes, Best Buddies, Outdoor Adventure Club, E-gaming, Robotics, and Bring Change to Mind. (Axel-Adams Dec. ¶¶ 9, 12).[3] Given that a limited open forum for purposes of the Equal Access Act is created when at least one noncurriculum related club is allowed to meet on school premises during

---

[3]    The question of whether or not a school organization is curriculum related is a fact question, with the burden of proof on the School. *Mergens*, 496 U.S. at 240; *Pope by Pope v. East Brunswick Bd. of Educ.*, 12 F.3d 1244, 1252 (3d Cir. 1993). However, courts, including this Court, have recognized that some of the above groups, at least in other schools, are not curriculum related. In *Franklin Central Gay/Straight Alliance* Judge McKinney noted that both the SADD and Mat Maids groups at the school in question were not academic clubs. 2002 WL 32097530 at *2. *See also Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 117 n.17 (D. Mass 2003) (noting that SADD was not curriculum related). In *American Humanist Association, Inc. v. Douglas County School Dist. RE-1*, 859 F.3d 1243, 1248 (10th Cir. 2017), Fellowship of Christian Athletes was referred to as a "non-curricular club at the school." And, in *Krestan v. Deer Valley Unified School District No. 97, of Maricopa County*, 561 F. Supp. 2d 1078, 1082 (D. Ariz. 2008), Best Buddies was recognized (along with a GSA) as one of a number of "noncurriculum clubs."

noninstructional time, 20 U.S.C. § 4071(b), it is clear that such a forum has been created by the School here. The strictures of the Act therefore apply.

**3.    The School is violating the Equal Access Act with regard to PHGSA and its members**

As noted, the equal access demanded by the Equal Access Act requires that a noncurriculum related student group be given all the benefits of "[o]fficial recognition, such as "access to the school newspaper, bulletin boards, the public address system, and the annual Club Fair." *Mergens*, 496 U.S. at 248. The Act is violated if a student organization is denied this access "on the basis of the religious, political, philosophical, or other content of the speech" of the group. 20 U.S.C. § 4071(a). Although PHGSA is being allowed by the School to meet on school premises after school hours, there is no doubt that it is being denied the full access granted to other noncurriculum related groups and that this denial is solely because of the nature and content of the organization's speech.

Given that, for example, Mat Maids, whose purpose "is to support wrestling by attending the meets and serving as host/hostesses at all tournaments" is listed in the Student Handbook and is allowed to advertise at the school and fundraise (Handbook at 75), it is clear that PHGSA is being denied equal access.[4]  Similarly, a club designed to

---

[4]    The Handbook listing for Mat Maids also notes that "[s]upport is also given to the wrestling team through money-making projects. Many social gatherings are held to provide opportunity for Mat Maids, wrestlers, parents, and friends to come together for fun." (Handbook at 75).

"provide students with opportunities for outdoor activities" is listed in the Handbook and may have its information announced during school announcements over the campus radio station. (Handbook at 76; Axel-Adams ¶ 11). Of course, as noted above, these are not the only noncurricular groups that are given access to advertising and other opportunities at the School, (Axel-Adams ¶¶ 9-13), opportunities that are denied to PHGSA.

This denial of equal access is unlawful under the Act if it is based on the content of the expression of PHGSA. It clearly is. The Principal has stated that the reason that PHGSA is being denied the same access granted to many noncurriculum related groups is to allow the School to remain "neutral" on LGBT issues. The School's actions are therefore based solely on the message that PHGSA expresses concerning those issues. This is content-based and is unlawful. In an analogous situation in *Franklin Central Gay/Straight Alliance* the defendants were willing to allow a GSA to meet but wanted it to change its name to "the Diversity Club" to appeal to all marginalized students, not just to LGBT students. 2002 WL 32097530, *1.  In granting summary judgment to the plaintiffs, Judge McKinney found that the school's "attempt to force GSA to dilute its message" violated the Equal Access Act. 2002 WL 32097530, *21. The same is true here. The School is attempting to dilute and suppress the message of PHGSA precisely because of the message. The Act is violated.

### B.    The School's actions also violate the First Amendment

[13]

Given the clear statutory violation here, there is no need to address PHGSA's further argument that its First Amendment rights and those of its members have been violated. *See, e.g.*, *Mergens*, 496 U.S. at 247 ("Because we rest our conclusion on statutory grounds, we need not decide—and therefore express no opinion on—whether the First Amendment requires the same result."); *Boyd County*, 258 F. Supp. 2d at 691 (same); *Franklin Central Gay/Straight Alliance*, 2002 WL 32097530, *21 (same). However, the First Amendment violation here is apparent.

The most rigorous scrutiny under the First Amendment is reserved for content-based regulations of expression. This is because "a government . . . has no power to restrict expression because of its message, its ideas, its subject matter, or its content" and therefore "[c]ontent-based laws – those that target speech based on its communicative content – are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Arizona,* 576 U.S. 155, 163 (2015) (internal quotations and citations omitted). In the context of schools, the Supreme Court has held that generally students retain their First Amendment rights unless the school demonstrates that the expression caused or would cause a material and substantial interference with the educational function of the school. *Tinker v. Des Moines Indep. Sch. Community Sch. Dist.*, 393 U.S. 503, 509 (1969).[5]

---

[5]    The Equal Access Act incorporates the *Tinker* standard by providing that a school does not have to allow meetings that "materially and substantially interfere with the orderly conduct of educational activities within the school" and further provides that "[n]othing in this subchapter

Such interference may justify some intrusion into the First Amendment rights of students.[6]

The School is explicitly denying the benefits to PHGSA afforded to many other student organizations because of the pro-LGBT message delivered by the group and the perceived desire of the School to stay "neutral" regarding that message. This is obviously content based. The group, meeting after school during noninstructional time, has not been, and will not be, disruptive of the high school's educational environment. There is therefore no justification, compelling or otherwise, that supports the School's decision. The School's treatment of PHGSA and its members therefore violates the First Amendment as well as the Equal Access Act.

### C.    The School's treatment of PHGSA violates the equal protection rights of the group and its members

If an equal protection challenge is mounted to a classification that burdens a fundamental right or a suspect class, it must satisfy strict scrutiny, *i.e.*, it must be narrowly tailored to support a compelling interest. *Zablocki v. Redhail*, 434 U.S. 673, 679, 682 (1978);

---

shall be construed to limit the authority of the school, its agents or employees, to maintain order and discipline on school premises, to protect the well-being of students and faculty, and to assure that attendance of students at meetings is voluntary." 42 U.S. C. § 4071 (c)(4), (f). *Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 870 (2d Cir. 1996).

[6]    The Supreme Court has also recognized that a content-based restriction on student speech in school is permissible if the speech is profane or lewd or endorses drug use. *Morse v. Frederick,* 551 U.S. 393, 409 (2007); *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986). The expression of PHGSA does not fall into these categories of speech.

*Baskin v. Bogan*, 12 F. Supp. 3d 1144, 1159 (S.D. Ind. 2014) (citing *Zablocki*), *aff'd*, 766 F.3d 648 (7th Cir. 2014). "[I]f a law neither burdens a fundamental right nor targets a suspect class, [a court] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996).

As noted, the actions of the School burden the fundamental expressive rights of PHGSA and its members. The sole justification for the differential treatment meted out to PHGSA is the School's avowed interest in remaining "neutral." It is not clear how allowing a club to exist is an abandonment of neutrality. Certainly, a lawsuit would not club recognized by the School is an abandonment of the School's constitutionally mandated neutrality towards religion given that "the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 839 (1995).

Indeed, determining that the School should remain "neutral" with respect to PHGSA, but abandoning the need to remain neutral with respect to Christian athletes, or with regard to persons working with those with developmental disabilities, or those who enjoy outside activities, is itself a content-based decision on the part of the School. Moreover, making a neutrality argument makes little sense against the backdrop of the Equal Access Act that was enacted specifically to enforce the neutrality that Congress

[16]

believed was not being observed in the treatment of student groups. *Mergens*, 496 U.S. at 234 (citing *Widmar v. Vincent*, 454 U.S. 263 (1981), and Congress's extension of the *Widmar* reasoning to secondary schools in the Equal Access Act). Indeed, in *Mergens*, the Court rejected the argument that allowing the religious club to meet at the school violated the neutrality demanded by the Establishment Clause as "there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercises Clauses protect." 496 U.S. at 250 (Court's emphasis). As the Court noted, "[w]e think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis." *Id.* Granting PHGSA the same benefits and privileges as other noncurriuclum related clubs is neutral and will be perceived as such.

There is therefore not a compelling justification for the difference in treatment that burdens PHGSA and its members equal protection rights. Strict scrutiny is not met. But even if the highly deferential rational basis scrutiny applied, *see Box v. Planned Parenthood of Indiana and Kentucky, Inc.*, __U.S.__, 139 S. Ct. 1780, 1782 (2019) (per curiam), the differential treatment at issue here would fail to satisfy it.  Even under rational-basis review, "courts examine, and sometimes reject, the rationale offered by the government for the challenged discrimination." *Baskin*, 766 F.3d at 654) (citing *Village of Willowbrook v.*

[17]

*Olech*, 523 U.S. 562 (2000) (per curiam)). *See also, e.g., Romer*, 517 U.S. at 626-35; *City of Cleburne v., Cleburne Living Center*, 473 U.S. 432, 447-50 (1985).

Certainly, maintaining neutrality is a legitimate interest. However, discriminating against PHGSA is not rationally related to that interest. Again, allowing PHGSA to have the same benefits as other noncurriculum related organizations is not a surrender of neutrality. As the Court stated in *Mergens*, in language apposite to this case,

> petitioners' fear of a mistaken inference of endorsement is largely self-imposed, because the school itself has control over any impressions it gives its students. To the extent a school makes clear that its recognition of respondents' proposed club is not an endorsement of the views of the club's participants . . . students will reasonably understand that the school's official recognition of the club evinces neutrality toward, rather than endorsement of, [the club's] speech.

496 U.S. at 251. The discrimination against PHGSA fails even rational basis scrutiny as it is not rationally related to the articulated purpose of maintaining neutrality, and given the beneficial purposes served by the group, there are no rational reasons justifying the School's position and actions.

## II.    The other requirements for the grant of a preliminary injunction are met

### A.    PHGSA and its members are facing irreparable harm for which there is no adequate remedy at law

It is beyond dispute that "the loss of First Amendment freedoms, even for minimal periods of time unquestionably constates irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The same is true of violations of the Equal Access Act, a law that "protects free speech rights." *Hsu*, 85 F.3d at 872. Moreover, PHGSA has been hampered in its beneficial

purpose of providing education and refuge to marginalized students and this "inability to effectively address the hardships" encountered by members and potential members is also irreparable harm. *Colin ex rel. Colin v. Orange Unified School Dist.*, 83 F. Supp. 2d 1135, 1149 (C.D. Calif. 2000) (granting a preliminary injunction in favor of a GSA). Absent a preliminary injunction, PHGSA will be hampered in providing a necessary "forum for discussion with other students who are suffering the effects of harassment based on sexual orientation, and [will be] unable to work with other students to foster tolerance among all students." *Boyd County*, 258 F. Supp. 2d at 692.

The Seventh Circuit has stressed that the "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Similarly, money damages are not sufficient to rectify the irreparable injuries being suffered here by PHGSA and its members.

### B.    The balance of harms favors PHGSA and its members

The Seventh Circuit in *Christian Legal Society* stressed that a governmental entity cannot claim that requiring it to comply with the First Amendment is harmful or burdensome. *See* 453 F.3d at 867 (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the] claimed harm is no harm at all"). The same is true of compliance with the Equal Access Act that, as noted above, protects free speech rights. *Hsu*, 85 F.3d at 872.

[19]

Moreover, "[c]ompliance with an injunction will not require much effort or expense, nor will allowing the GSA Club to meet harm others." *Boyd County*, 258 F. Supp. 2d at 692. This lack of harm to the School must be balanced against the clear and continuing harm being suffered by PHGSA and its members. The balance of harms is clearly in the favor of plaintiff and its members.

### C.     The public interest will be served by the grant of a preliminary injunction

"Just as constitutional violations—and by extension Equal Access Act violations—constitute irreparable harm. the exoneration of any such violations would serve to satisfy the public interest requirement." *Boyd County*, 258 F. Supp. 2d at 692. The Seventh Circuit has noted that "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Society*, 453 F.3d at 859. The same is true here.

"Additionally, while the primary teachers of tolerance should always be the parents and not the teachers and school administrators, school officials can play a vital role in fostering tolerance to its students. If, by permitting the GSA Club to meet, students are less likely to be the subject of hate crimes by fostering tolerance in the school community, the public interest is served." *Boyd County*, 258 F. Supp. 2d at 692.

### III.    The preliminary injunction should issue without bond

While Federal Rule 65, by its terms, requires that a preliminary injunction be accompanied by "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," Fed. R.

Civ. P. 65(c), no bond should be required in the absence of monetary injuries. *See, e.g.,*

*Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). The issuance of a preliminary

injunction will not result in any monetary harm to the School, and no bond should be

required.

**Conclusion**

A preliminary injunction should therefore issue, without bond, requiring the

School to allow the PHGSA to be listed in the Student Handbook and to be given the

same access to bulletin boards, radio announcements, and other means of publicity, as

other noncurricular related clubs.

Kenneth J. Falk
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiff

Certificate of Service

I hereby certify that on this 6th day of October 2021, a copy of the foregoing was filed electronically with the Clerk of this Court and was served on the below-named persons by first class U.S. postage, pre-paid.

South Madison Community School Corporation
203 S. Heritage Way
Pendleton, IN 46064

Principal
Pendleton Heights High School
1 Arabian Drive
Pendleton, IN 46064

Kenneth J. Falk
Attorney at Law

[22]