UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PENDLETON HEIGHTS GAY-STRAIGHT ALLIANCE, an unincorporated association, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:21-cv-02480-JRS-TAB |
| SOUTH MADISON COMMUNITY SCHOOL CORPORATION, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

**Reply Memorandum in Support of Motion for Preliminary Injunction**

**I. Introduction**

The defendants ("School") do not disagree that if they allow one noncurriculum related club to advertise and fundraise at Pendleton Heights High School ("PHHS"), they must extend these benefits to the Pendleton Heights Gay-Straight Alliance ("PHGSA"). Nor could they, as the Equal Access Act, 20 U.S.C. § 4071, is clearly violated by this disparate treatment for its "obligations . . . are 'triggered' even if the school only permits one noncurriculum group to meet." *Straights and Gays for Equality (SAGE) v. Osseo Area Schools-Dist. No. 279* ["Sage I"], 471 F.3d 908, 911 (8th Cir. 2006).[1] And, it is not disputed that the obligations required by the Equal Access Act extend not just to the right of noncurriculum-related clubs to meet at a school if at least one other such group is allowed to meet, but also to all other "attendant benefits uniformly afforded to each of its noncurricular student groups," *Gonzalez through Gonzalez v. School Bd. of Okeechobee Co.*, 571 F. Supp. 2d 1257, 1267 (M.D. Fla. 2017. This includes the right to have "equal access to

---

[1] For the Equal Access Act to apply the School must receive federal financial assistance. 20 U.S.C. § 4071a). The School concedes that it is such a recipient. (Dkt. 15 [Defendants' Answer to Plaintiff's Complaint for Injunctive and Declaratory Relief ¶ 29]).

available avenues to communicate" to fellow students. *Straights and Gays for Equality (SAGE) v. Osseo Area Schools-Dist. No. 279* ["Sage II"], 540 F.3d 911, 914 (8th Cir. 2008). Nor does the School deny that although groups that it deems to be curriculum related are allowed to fundraise, to advertise on the bulletin and message boards available at PHHS, and to be part of daily announcements broadcast to the student body, these significant benefits are not extended to PHGSA because it is deemed to be noncurriculum related. (Dkt. 10-1 ¶ 19; 16-2 at 24 [ll. 4-17]; 59 [l. 8] – 60 [l.7][2]).

What the School argues is that many groups that appear to have no connection to PHHS's curriculum are, in fact, curriculum related, thus justifying the exclusion of PHGSA from the substantial benefits afforded to these other groups. In advancing this argument the School ignores the language of the Equal Access Act as interpreted by the Supreme Court in Board *of Westside Community Schools v. Mergens*, 496 U.S. 226, 239 (1990), and the argument renders the definition of curriculum related so broad as to be meaningless. A host of groups that are not curriculum related as defined by the Equal Access Act are extended the benefits received by curriculum-related groups—benefits denied to PHGSA. A preliminary injunction must issue to rectify this unequal and unlawful treatment.

**II.     PHGSA will prevail on the merits of its claims**

    **A.     There are numerous groups at PHHS that are afforded all the benefits of curriculum-related clubs, but that do not satisfy the Equal Access Act's definition of curriculum related and therefore the discrimination against PHGSA violates the Act**

        **1.     *Mergens* stresses that the Equal Access Act's concept of curriculum-related group must be interpreted narrowly**

---

[2]     Docket No. 16-2 is the deposition of PHHS Principal Connie Rickert, as a Rule 30(b)(6) designate. (Dkt 16-2 at 5 [l. 20] – 6 [l. 14]).  The page numbers of exhibits cited in this memorandum are those assigned by the Court's electronic filing system.

As noted, the Equal Access Act prohibits discrimination against noncurriculum-related groups once the school creates a limited open forum, which occurs "whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during instructional time." 20 U.S.C. § 4071(b). In such a situation the noncurriculum groups must be treated the same so that if certain benefits are extended to some noncurriculum-related clubs, they must be extended to all. *Mergens,* 496 U.S. at 247 And, as PHGSA has previously noted, the Supreme Court was quite clear in *Mergens* that the concept of "curriculum related" must be interpreted extremely narrowly, given the expansive legislative purpose of the statute.

> [T]he term "noncurriculum related student group" is best interpreted broadly to mean any student group that does not *directly* relate to the body of courses offered by the school. In our view, a student group directly relates to a school's curriculum if the subject matter of the group is actually taught, or will soon be taught, in a regularly offered course; if the subject matter of the group concerns the body of courses as a whole; if participation in the group is required for a particular course; or if participation in the group results in academic credit. We think this limited definition of groups that directly relate to the curriculum is a commonsense interpretation of the Act that is consistent with Congress' intent to provide a low threshold for triggering the Act's requirements.

*Id.* at 239-40 (emphasis by the Court).[3]

Thus, "[t]he circle of groups considered 'curriculum related' has a relatively small circumference and does not including 'anything remotely related to abstract educational goals'; instead, the Court limited the definition of 'curriculum related student group' to support 'Congress's intent to prove a low threshold for triggering the Act's requirements.'" *Sage II*, 540 F.3d at 912 (quoting *Mergens*, 496 U.S. at 240, 244). The Equal Access Act, as interpreted by *Mergens*, creates a "strict framework in which schools can operate with regard to student groups."

---

[3]  This definition of curriculum related has been adopted by the School. (Ex. 2 to Dkt. 16-2 at 82).

*White County High School Peers in Diverse Education v. White County School Dist.*, 2006 WL 1991990, at *12 (N.D. Ga. July 14, 2006).

> **2. Numerous student groups that the School claims are curriculum related are not**

"The burden of showing that a group is directly related to the curriculum rests on the school district." *Pope by Pope v. East Brunswick Bd. of Educ.*, 12 F.3d 1244, 1252 (3d Cir. 1993) (citing *Mergens*, 496 U.S. at 240); *see also Franklin Central Gay/Straight Alliance v. Franklin Twp. Community School Corp.*, 2002 WL 32097530, at *15 (S.D. Ind. Aug. 20, 2002) (same). The School attempts to satisfy its burden by focusing on several groups that it deems are curriculum related, but these groups fall far short of the definition established by *Mergens*. And the School fails to mention other groups that also are not curriculum related that it nevertheless extends full benefits to as if they were curriculum related.

> **a. Outdoor Adventure Club**

Outdoor Adventure Club is deemed by the School to be a curriculum-related group. (Dkt. 16-2 at 25 [ll. 13-22]; Ex. 5 to Dkt. 16-2 at 91). The PHHS Student Handbook states that "[t]he purpose of Outdoor Adventure Club is to provide students with opportunities for outdoor activities and to promote physical fitness. Group outings include activities such as camping, horseback riding, canoeing, rock climbing, hiking, spelunking, and skiing." (Ex. 5 to Dkt. 16-2 at 91). It is frequently, and repetitively, advertised on the school's announcements broadcast to students. (*See* Declaration of Ann D'Angelo ["D'Angelo"] ¶¶ 6-7, attached to this Memorandum as Exhibit 1).[4]

---

[4] For example, on October 1, 2021, the following was broadcast to the students at PHHS:

> Have you ever wanted to climb on cliffs? How about snow skiing or snowboarding? Do you like camping, hiking, kayaking down a river? Have you ever walked and crawled through a cave? Does paintball sound like fun? These are some of the possibilities when you join the Outdoor Adventure Club. Come to a

[4]

No academic credit is awarded for Outdoor Adventure Club (Dkt. 16-2 at 38 [l. 21]). The School does not contend that any of the activities engaged in by the club are taught at the school or part of the physical education curriculum, a point that is confirmed by the student-leader of PHGSA. (Supplemental Declaration of Reece Axel-Adams ["Reece Axel-Adams Supp."] ¶ 5, attached to this memorandum as Exhibit 2; Dkt. 16-4 at 4 [l. 22] – 5 [l. 7]). However, the School argues that this club is related PHHS's physical education curriculum, quoting the Indiana Department of Education's standards concerning physical education, which note that the goal of such education is to develop "physically literate individuals who have the knowledge and skills to enjoy a lifetime of healthful physical activity." (Dkt. 16 at 11 [internal citation and quotation marks omitted]).

In *Mergens* the school raised a nearly identical argument, contending that its Subsurfers club, for students interested in scuba diving, was curriculum related because it "further[ed] 'one of the essential goals of the Physical Education Department—enabling students to develop lifelong recreational interests.'" 498 U.S. at 243-44. The Supreme Court found that Subsurfers did not directly relate to the school's curriculum as whole, was not required, and thus was a "'noncurriculum related student group' for purposes of the Act." *Id.* at 245. The same is true here. *See also Donovan ex rel. Donovan v, Punxsutawney Area School Bd.*, 336 F.3d 211, 221 (3d Cir. 2003) (noting that a ski club was not curriculum related). "Curriculum related must mean something other than being 'remotely related to abstract educational goals;' otherwise, 'no school

---

call out meeting Wednesday the 6th of October in Room 220, Mr. Hinton's room, either before school at 7:10 or after school at 2:35.

(D'Angelo ¶ 7). The above announcement was repeated, in substantially similar form, on October 4th, 5th, and 6th. (*Id.*).

[would have] limited fora . . . and schools could evade the Act by strategically describing existing groups." *Boyd County High School Gay Straight Alliance v. Board of Educ. of Boyd Co., Kentucky*, 258 F. Supp. 2d 667, 681 (E.D. Ky. 2003) (quoting *Mergens*, 496 U.S. at 239-40) (alterations by the district court). Outdoor Adventure Club is not curriculum related.

### b. Book Club

For the same reasons, the Book Club—also deemed by the School to be curriculum related—is not. (Dkt. 16-2 at 25 [ll. 13-22]; Ex. 5 to Dkt. 16-2 at 90). According to the Handbook this club is "a student book discussion group. Students select book titles to read and then meet for a group discussion and snacks." (Ex. 5 to Dkt. 16-2 at 90). No academic credit is awarded but the School deems it to be curriculum related as it "[j]ust continu[es] and expand[s] their knowledge of literacy." (Dkt. 16-2 at 35 [ll. 28-21]). However, if continuing and expanding knowledge, without more, makes a group curriculum related, then a limitless number of student groups with no direct relationship to curriculum---including, potentially, the PHGSA—could be deemed to be curriculum related. Indeed, taken together with its rationale for Outdoor Adventure Club, any club that the School deemed to lead to future healthy bodies or healthy minds would be deemed curriculum related. This would render the requirements of "the Act merely hortatory." *Mergens*, 496 U.S. at 244. The group is not curriculum related.

### c. The Muse

The Muse is PHHS's literary magazine. According to the Handbook it is "[p]ublished twice annually," and it "features student art and writing, which have been selected for publication by a student committee." (Ex. 5 to Dkt. 16-2 at 90). Credit is not given to students who participate. (Dkt. 16-2 at 35 [l. 25] – 36 [l. 2]). Some of the material submitted by students has been created in classes, but that is not required, and some of the material is composed by students away from

school. (*Id.* at 36 [ll. 9-21]). The only explanation as to why The Muse is curricular is that it gives students the opportunity to learn skills that may help them in their future post-school life.

> A. You said for those people that are not doing it for a course, how is that curricular-related?
>
> Q. Right
>
> A. We—I mean, the goal of high school is to hope that these kids will continue in the courses and expand their knowledge of it or expand their practice of it.
>
> Q. Okay
>
> A. And I think we probably all can agree the overall goal of high school is to have kids go out and take what they've learned in a class and apply it to jobs or skills. So it gives them opportunities to continue practicing their writing or their publications or their artwork.

(*Id.* at 36 [l. 24] – 37 [l. 11]).

Of course, the entire high school experience seeks generally to teach behaviors that will hopefully help the students in their lives as adults. But the Supreme Court in *Mergens* stressed that a curriculum related group must have "more than just a tangential or attenuated relationship to courses offered by the school." 496 U.S. at 238. Here, the School has not argued that The Muse is even tangentially related to courses at school. Instead, it argues that it is potentially tangentially related to the students' future lives. This is not curriculum related.

### d. e-Sports

On October 16, 2021, the Board of Trustees of the South Madison Community School Corporation ("School Board") approved three new clubs that it asserted were curriculum based, including e-Sports. (Dkt. 16-2 at 9 [ll. 9-17]; 48 [l. 17] – 49 [l. 4]). The School argues that the e-Sports club is connected to the computer science curriculum at the school and that the club is related to an anticipated expansion of its computer science curriculum in the upcoming years, in

which students may learn computer programming. (Dkt. 16 at 12-13). However, students are not required to be in any particular courses to be in e-Sports and no academic credit is awarded to participants. (Dkt. 16-2 at 51 [ll. 3-7]).

The School also notes that e-Sports may teach skills useful in later life as, for example, periscopes in the Navy now work with Xbox controllers. (*Id.* at 52 [l. 51 [l. 24] – 52 [l. 6]). The club will also impart lessons about not staying up too late e-gaming and encourages responsible digital citizenship. (*Id.* at 51 [ll. 10-23]).

But the bottom line is that this is a club where some students will participate as a place of enjoyment. (*Id.* at 52 [ll. 7-12]). Despite the didactic sheen attempted by the School, e-Sports is a place to play videogames. The fact that it may, for some students, review skills learned in classes, does not mean it is curriculum related. *Mergens* requires

> that the *subject* matter of the student group must be taught in a class. Thus, a chess club does not become curriculum-related merely because its subject matter relates to mathematics and science by building the ability to engage in critical thought processes; unless chess is actually taught, the club is a noncurriculum related student group.

*Pope,* 12 F. 3d at 1253 (emphasis by the court). Similarly, e-Sports is also noncurriculum related.

e. **Robotics**

Another new club deemed to be curriculum based that was approved by the School Board on October 16, 2021, is Robotics. (Dkt. 16-2 at 48 [l. 17] – 49 [l. 8]). Robotics is a club where students build robots and, hopefully, compete in tournaments (*Id.* at 49 [l. 9-18]). The School argues that in this club students "apply their knowledge of engineering and computer science and specifically, the curriculum of the Principles of Engineering course." (Dkt. 16 at 11). But, again, there is no credit for Robotics and there are no specific courses that must be taken to be in Robotics. (Dkt. 16-2 at 49 [ll. 19-24]).

As noted above, the fact that a club relates to the curriculum in some way does not make the club curriculum based. It is difficult to argue that a club directly relates to the curriculum when no courses are required as a precondition to participating in the club. In *Mergens* the Court noted that physical education classes at the school included swimming, but since scuba was not offered as a course, Subsurfers, the scuba club, did not directly relate to the curriculum. 496 U.S. at 245. Similarly, Robotics does not directly relate to the School's curriculum.

### f. Best Buddies, Students Against Destructive Decisions (SADD), Bring Change to Mind, Beta Club

The School has a few clubs, Best Buddies, Students Against Destructive Decisions (SADD), Bring Change to Mind, and Beta Club, which provide no academic credit and which the school does not argue are related directly to specific courses.[5] Nevertheless, the School contends these clubs are curriculum related because they may lead to certification of employability skills that will be necessary for graduation beginning with the class of 2023. The school errs.

### i. The graduation standard

---

[5] As noted in the PHHS Handbooks, "Best Buddies is the world's largest organization dedicated to ending the social, physical and economic isolation of the 200 million people with intellectual and developmental disabilities around the world. Best Buddies is open to all students." (Ex. 5 to Dkt. 16-2 at 90). As set out below, the School argues that participation in Best Buddies can lead to satisfying a graduation requirement. However, it does not provide any of the 40 credits needed for graduation. (Dkt. 16-2 at 27 [ll. 14-24]).

SADD "is a student organization that promotes making good choices and a healthy lifestyle. Students participate in various activities including peer to peer events, trips to elementary schools to promote healthy choices and various events in the community and around the state." (Ex. 5 to Dkt. 16-2 at 91). No academic credit is given for participation. (Dkt. 16-2 at 40 [ll. 16-20]).

Bring Change to Mind is the final new, assertedly curricular, club approved by the School Board on October 16, 2021. (*Id.* at 48 [l. 17] – 49 [l. 8]). It allows students to have a voice and platform to advocate for mental health and destigmatize mental health issues. (*Id.* at 52 [l. 14] – 53 [l. 2]). It does not provide academic credit and there is no requirement that any particular course be taken by the student-participants. (*Id.* at 53 [ll. 5-7]).

The National Beta Club is a service leadership Club that promotes academic excellence and learning. (Dkt. 16-2 at 37 [l. 12] – 38 [l. 6]). No credit is received for participation. (*Id.* at 37 [ll. 16-18]).

Beginning with the class of 2023, for an Indiana student to graduate high school the student must accomplish three things: 1) complete certain course requirements; 2) satisfy the employability skills standards; and 3) complete course, testing requirements, technical education, or certifications demonstrating postsecondary-ready competencies. (Dkt. 16 at 6). The employability skills standards can be satisfied by a project-based learning experience, service-based learning experience, or work-based learning experience. (*Id.*). There is no specific hour requirement to obtain certification that the employability skills standards have been met. (Dkt. 16-2 at 32 [l. 24] – 33 [l. 4]; 71 [ll. 14-20]). What is required is that the sponsor of the activity confirm that the skill standard has been met. (*Id.* at 33 [l. 2-4]).

The School argues that since students who participate in Best Buddies, SADD, Bring Change to Mind, or Beta Club can satisfy one or more of the learning experiences necessary to satisfy the standards, the clubs are therefore curriculum based. This is erroneous.

    **ii.**  **The above clubs cannot be deemed to be curriculum related because the School concedes that the employability skills standards can be satisfied by activities that have nothing to do with the School's curriculum**

The School labors mightily to demonstrate that participation in one of these four clubs can lead to certification by the club's sponsor that the employability skills standards required for graduation as of 2023 have been met. PHGSA concedes this. But the School acknowledges that the standards can be met by work done by a student in any number of activities, including in a variety of noncurricular clubs or from private employment entirely outside of the school context, with attendant certification by a sponsor or employer.

  Q.  What would they have to do in order to graduate?

  A.  On the employability skills?

Q. Yes

A. They could do a variety of different things. The kids can earn their employability skills by actually having a job. So a boss at any workplace can sign off on that.

Our athletes receive credit for the employability skills if they play a sport.

(Dkt. 16-2 at 31 [ll. 8-17]).

Q. Bucket 2 [for graduation] is both employability and/or service based learning; is that correct?

A. Correct . . .

*       *       *

A. And so employability skills can be covered through project-based learning, service-based learning, or work-based learning.

So the work-based is employability. The service-based is the clubs that we have that provide services or volunteer hours. Project-based learning can be certain courses that we have where they produce a product in that class.

Q. And you testified before there's nothing to prevent a sponsor of a non-official club from certifying that a student has fulfilled their bucket for work that he or she or they did in that club; is that correct?

A. Correct.

(Dkt. 16-2 at 73 [ll. 3-5]; 73 [l. 14] -74 [l. 1]; *see also id.* at 33 [l. 17] – 35 [l. 16]).

The curriculum-related nature of a student club cannot come from a factor—the ability to satisfy the employability skills standards—that can also be replicated by participation in private employment or what the School considers to be a noncurriculum-related club. Therefore, the possibility that participating in Best Buddies, Students Against Destructive Decisions (SADD), Bring Change to Mind, and Beta Club may lead to satisfying the employability skills standard does not make the clubs, which do not provide academic credit, and which are not directly related to the curriculum, curriculum related.

### iii. The Supreme Court clearly held that "curriculum

[11]

### related" must be related to courses, not graduation requirements

The School's attempt to characterize clubs as curriculum related because they can potentially fulfill a graduation requirement unrelated to specific course work is problematic for another reason. *Mergens* and the Equal Access Act focus not on graduation requirements, but on actual courses.

> In our view, a student group directly relates to a school's curriculum in the subject matter of the group is actually taught, or will soon be taught, in a regularly offered course; if the subject matter of the group concerns the body of courses as a whole; if participation in the group is required for a particular course; or if participation in the group results in academic credit.

496 U.S. at 239-40. There must be a relationship between the club and actual courses. Thus,

> [f]or example, a scuba-diving group is not directly related to the school curriculum, even if swimming is taught as a physical education class, when scuba diving is not taught in any regularly offered course at the school and does not result in academic credit. Also, a chess club is a "noncurriculum related group" when no class requires participation in the club and participation in the group does not result in extra credit for a class. Finally, a student service organization that helps to enhance students' civic responsibilities to the community is not directly related to the curriculum where the subject matter of the group is not taught in a class.

*Sage I*, 471 F.3d at 912.

To the extent that the School contends that satisfying the employability skills graduation requirement results in a particular activity being conducted "for credit," this argument leads to an inflated view of "academic credit." For it means that working at Wendy's on the weekend, which can satisfy the employability skills standards, becomes a source of academic credit as does participating in a noncurriculum-related group where the sponsor certifies that the employability skills standard has been met. Playing on a sports team becomes "academic credit," as this also satisfies the rather expansive employability skills standards. (Dkt. 16-2 at 31 [ll. 16-19]). Not surprisingly, *Mergens* requires that something related to the curriculum be related to course work. Best Buddies, Students Against Destructive Decisions (SADD), Bring Change to Mind, and Beta

[12]

Club are not curriculum related. They do not give students any of the academic credits they need to graduate.

###### g. Conclusion

Clearly there are groups at PHHS that are treated as, but are not, curriculum related. The above exhaustive review of the numerous student groups that are not curriculum related is, admittedly, overkill, given that, as noted above, "once a court determines that a limited open forum has been created because school access has been provided to at least one noncurriculum-related group, the access afforded must be equal to that provided to all groups, both curricular and noncurricular." *Boyd County*, 258 F. Supp. 2d at 684. However, the survey of the various noncurriculum-related groups that the School has argued are curriculum related is useful in emphasizing how far afield the school has strayed from the narrow definition of curriculum related that the Supreme Court adopted in *Mergens*.

This is also demonstrated by the fact that the Principal of PHHS, the deposition designate for the School, conceded that "I could see how the GSA would be curricular-related, as we talked about, students having acceptance, being more comfortable in their skin, reducing barriers." (Dkt. 16-2 at 63 [ll. 12-15]). This proves that the School has abandoned the narrow definition of curriculum related prescribed by *Mergens* for a pliable and expansive definition of its own making. Allowing the term curriculum related to be defined so broadly that it encompasses students playing video games, shooting paintballs at each other, or discussing books not assigned for any course, would render the concept of "curriculum related" meaningless and would allow a school to bestow the favored status of curriculum related only on groups that the school preferred.

### 3. At least in past years, the School has allowed groups that it admits are non-curriculum related access to the methods of communicating to students currently being denied to PHGSA

Throughout its memorandum, the School cites to the Pendleton Rugby Club, a non-curriculum club that it asserts has been denied the ability to be advertised in PHHS in the same way as PHGSA. (Dkt. 16 at 2, 4-5, 29). However in the 2020-2021 school year the Rugby Club was part of the daily announcements broadcast to the student body on several occasions. (D'Angelo ¶ 8 [noting announcements concerning Rugby on February 2 and 5 and a girls only rugby and wrestling clinic discussed on March 2-4]). And, on April 2 and April 5-7, 2021, the daily announcements broadcast information concerning the Bringing Change to Mind group, even though it was not designated a curriculum-related club until October 16, 2021. (D'Angelo ¶ 8; Dkt. 16-2 at 48 [l. 17] – 49 [l. 8]). Thus, it appears that at least prior to the desire of PHGSA to gain access to announcements and other forms of promotion made available to curriculum-related clubs, the School did allow avowedly noncurriculum-related clubs to have such access. This further illustrates that the School's definition of "curriculum related" is, contrary to the Supreme Court's holding in *Mergens*, infinitely elastic.

### 4. Failure to afford PHGSA with the same benefits as other noncurriculum-related groups violates the Equal Access Act

Regardless of its behaviors in prior years, the School at this point has therefore created a limited open forum under the Equal Access Act by extending identical benefits to curriculum-related groups and certain noncurriculum-related groups. It may therefore not discriminate based on "the religious, political, philosophical, or other content of the speech" of other noncurriculum-related groups. 20 U.S.C. § 4071(a). Those groups must be given the same benefits concerning the means of access within PHHS as are the groups recognized by the School. *Mergens*, 496 U.S. at 247.

The School argues, in passing, that it is not discriminating against PHGSA because of disagreement with its message, but because it is not curriculum related. (Dkt. 1 at 1-2). Of course,

this is no justification at all, given that the School extends the significant benefits of allowing access to the school population through advertising and listing in the Handbook to other noncurriculum-related groups.

And while the School argues, also in passing, that it has never stated that it must remain neutral regarding LGBT issues (*id.*), it most certainly has. Towards the end of the last school year there was controversy over the fact the School had required teachers to remove LGBTQ pride flags from their classrooms. (Dkt. 16-2 at 55 [l. 19] -56 [l. 6]; Declaration of Robyn Axel-Adams ["Robyn Axel-Adams] ¶ 2, attached to this memorandum as Exhibit 3). After School Board meetings during which the Board heard public comments on LGBTQ matters, the Board issued a specific statement indicating that the South Madison Community School Corporation "is obligated to maintain viewpoint neutrality in speech; that is the corporation generally cannot sponsor one side without being willing to give an equal platform to an opposing viewpoint." (Robyn Axel-Adams ¶¶ 3-5; Attachment to Robyn Axel-Adams). Both the Principal of PHHS and the Superintendent of the Corporation have also stressed that the School must remain neutral on LGBTQ issues. (Dkt. 16-4 at 23 [l. 19] – 26 [l. 9]).[6]

Regardless of statements by the School Board or administrators concerning neutrality, the actions of the School here demonstrate that the PHGSA is being discriminated against based on the content of its speech. The Supreme Court has made it clear that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the

---

[6] Another issue that the School faced earlier this school year concerned the fact that PHHS had taken the position that transgender students had to be referred to by their "dead" names (the names on their birth certificates), unless parents gave their consent for the child to be referred to by the name aligned with the child's gender identity. (Robyn Axel-Adams ¶ 6). Reece and Robyn Axel-Adams met with the principal of PHHS to discuss this. (*Id.*; Dkt. 16-4 at 24 [l. 12] – 25 [l. 2]).

idea or message displayed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A sign announcing the first meeting of the PHGSA was not allowed to be posted (Dkt. 16-2 at 59 [l. 8] - 60 [l. 7]; Ex. 9 to Dkt. 16-2 at 100), whereas Outdoor Adventure Club is free to put up its posters within PHHS. (Reece Axel-Adams Supp ¶ 3, Attachment to Reece Axel-Adams Supp.). The difference is the topic discussed or the idea or message displayed. No announcements for PHGSA are allowed at PHHS (Dkt. 16-2 at 59 [ll. 8-18]), whereas numerous groups, both curriculum related and noncurriculum related, are mentioned on the announcements, including, in the current school year, Beta Club, Bring Change to Mind, Best Buddies, SADD, FCCLA[7], FFA, the Muse, Art Club, German Club, Social Studies Academic Team, JAG Leadership Team, Spanish Club and Outdoor Adventure Club. (D'Angelo ¶ 8). The difference between the above-favored groups and PHGSA is the topics discussed and ideas and messages displayed. Bring Change to Mind, where students meet to discuss and to attempt to destigmatize mental health, is accorded the benefits of being curriculum related. But the PHGSA, where students meet for support and attempt to deal with what the School concedes are mental health and societal problems faced by LGBTQ persons (Dkt. 16-2 at 60 [l. 11] – 61 [l. 5])[8], is not given the same benefits. The difference

---

[7] FCCLA is Family, Career, and Community Leaders of America, and its "[m]embership is open to any student who has taken or which is currently taking Family and Consumer Science courses." (Ex. 5 to Dkt. 16-2 at 90).

[8]
    Q.    You would agree that, especially for adolescents, that there's frequently mental health and societal problems associated with being LGBTQ; is that correct?

    A.    Yes, that is what the statistics would show.

    Q.    And that groups like a GSA are very useful for students' mental health; is that correct?

    A.    They could be.

    Q.    And they're also useful, even for students who are not LGBTQ, to sort of normalize them, normalize people who are transgender, along with people who are LGBTQ; is that fair?

between the two noncurriculum-related groups are based on content and the messages being expressed.

Once a limited open forum is created under the Equal Access Act, a school cannot discriminate "on the basis of the religious, political, philosophical, or other content of the speech." 42 U.S.C. § 4071(a). The School is engaging in such discrimination by denying to the PHGSA the benefits given to many other noncurriculum-related groups. This violates the Act.

B.  **The actions of the school also violate both the First Amendment and Equal Protection**

The School makes no response to the constitutional arguments advanced by PHGSA (Dkt. 10 at 13-18), implicitly resting on its argument that all the groups that it has extended advertising and other benefits to are curriculum related. As noted, they are not.

As indicated above, the School has engaged in discrimination against PHGSA that is content based. Given that the School has not even attempted to argue that extending the above benefits to PHGSA would cause a material and substantial disruption to the educational function of PHHS, the impingement on the First Amendment rights of the PHGSA and is student members is unlawful. *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 509 (1969), *see also* Dkt. 10 at 14-15.

Although the School does not explicitly address the equal protection argument made by

---

A.  That's fair.

Q.  And you would agree that being comfortable in your own skins, which is difficult for teenagers in the best of circumstances, is an extremely useful skill just for future mental health, as well as employability, as well as getting along with the world; is that fair?

A.  Yes.

(Dkt. 16-2 at 62 [l. 11] – 63 [l. 5]).

PHGSA, it is presumed that it believes that it is rational to distinguish between curriculum-based groups and those that are not curriculum based. However, as described above, the School has not actually made this distinction. It has instead allowed certain noncurriculum-based groups to be given the same benefits as are extended to curriculum-based groups while excluding PHGSA.

The only other possible rationale is the articulated need to be "neutral." But, as PHGSA has noted previously (Dkt. 10 at 16-18), extending the same benefits to PHGSA as are extended to, for example, Outdoor Adventure Club, does not undermine any position of neutrality, any more than having an e-Gaming club means that the School endorses the student body playing videogames. Again, as the Supreme Court noted in *Mergens,* "[t]o the extent a school makes clear that its recognition of respondents' proposed club is not an endorsement of the views of the club's participants . . . students will reasonably understand that the school's official recognition of the club evinces neutrality toward, rather than endorsement of, [the club's] speech." 496 U.S. at 251.

**III.    The further requirements for the grant of a preliminary injunction are met**

1.  <u>Irreparable harm:</u>    The School argues that PHGSA will not suffer irreparable harm here because it is allowed to meet and can advertise through other means, such as social media. This ignores the fact that violation of the First Amendment "even for minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Similarly, violation of the Equal Access Act also constitutes irreparable injury. *Hsu ex rel. Hsu v. Roslyn Union Free School Dist. No. 3*, 85 F.3d 839, 872 (2d Cir. 1996).

Moreover, there is a significant difference between trying to reach students on social media as opposed to reaching them through physical signs or announcements on the school's daily broadcasts. For example, between the beginning of this school year and December 8, Outdoor Adventure Club was mentioned 14 times, Beta Club was mentioned 16 times, and Best Buddies

was mentioned 13 times. PHGSA is denied this vital method of growing its membership. (Dkt. 10-1 ¶¶ 21, 23).

PHGSA and its members are suffering irreparable harm for which there is no adequate remedy at law.

2. <u>The balance of harms</u>: The School argues that it is facing harm if a preliminary injunction is granted because "if one noncurricular group is allowed to advertise. . . all noncurricular groups must be allowed to do so." (Dkt. 16 at 29). However, to the extent that this is harmful to the School, it is a harm of its own making as it has determined to allow certain noncurriculum-related groups the same access as curriculum related groups, thus implicating the Equal Access Act. In any event, if more groups step forward, the School can certainly impose neutral limits on the frequency of posting of announcements on bulletin boards and on the daily broadcasts to fairly and evenly allocate any space and time limitations. The School also complains about the cost of having to reprint a revised Student Handbook to include PHGSA. Any reprinting could, of course, be delayed until the next school year and the change could immediately be made, presumably at low or no cost, to the online version of the Handbook. *See* Pendleton Heights High School Student Handbook, https://smcsc.com/common/pages/DisplayFile.aspx?itemId=521370 (last visited Dec. 13, 2021).

3. <u>The public interest:</u> The School argues that the public interest is not served by opening its announcements, bulletin boards, and Handbook to all noncurriculum-related groups. (Dkt. 16 at 29). This ignores the fact that the School has already opened the fora to some, but not all, noncurriculum-related groups, and that this selective approach violates both federal law and the Constitution. This does not serve the public interest and the School's actions hinder the beneficial effects that allowing PHGSA to flourish to the greatest extent possible would have on

PHHS and the PHHS community. As PHGSA previously noted, "[i]f by permitting the GSA club to meet, students are less likely to be the subject of hate crimes by fostering tolerance in the school community, the public interest is served." *Boyd County*, 258 F. Supp. 2d at 692.

## IV. Conclusion

A preliminary injunction should therefore issue requiring the School to extend to PHGSA all the benefits currently being afforded to other noncurriculum related clubs, including posting information on the PHHS bulletin and message boards, having announcements concerning its meeting and events broadcast on the PHHS daily announcements, being listed in PHHS publications, and being permitted to fundraise on PHHS grounds.[9]

Kenneth J. Falk
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiff

---

[9] PHGSA has previously asked that the injunction issue without bond. (Dkt 10 at 20-21). The School has not objected to this request and no bond should be required.